13 CV 4142

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

PATRICIA BENVENUTO, on
behalf of Herself and all Others Similarly Situated,

                Plaintiff,

    -against-

BP P.L.C., ROYAL DUTCH SHELL PLC, STATOIL
ASA, AND JOHN DOE NOS. 1-50,

                Defendants.

Docket No.

ECF Case

**CLASS ACTION COMPLAINT**
**JURY TRIAL DEMANDED**



RECEIVED
JUN 14 2013
U.S.D.C. S.D.N.Y.
CASHIERS

Plaintiff Patricia Benvenuto ("Plaintiff") complains, upon knowledge as to herself and her own acts, and upon information and belief[1] as to all matters, against Defendants BP p.l.c. ("BP"), Royal Dutch Shell plc ("Shell") and Statoil ASA ("Statoil") (all as defined below, and collectively "Defendants"), as follows:

## SUMMARY OF ALLEGATIONS

**Background.**

1.     Platts, a unit of McGraw-Hill Financial, Inc., is located in this District, and is the leading global provider of spot and contract pricing for the physical and derivatives Brent Crude oil markets.

2.     Platts' Brent Crude oil price assessments are used to price and settle physical floating Brent Crude oil deals under long-term contracts on a physical (spot) basis, and to settle Brent Crude oil derivatives contracts, including Brent Crude Oil Futures Contracts.[2]  Platts' price

---

[1] Plaintiff's information supporting her allegations made on information and belief include (a) public statements by the European Commission Competition Authority ("EC") about its investigation into manipulation in the North Sea Brent Crude oil ("Brent Crude oil") market; (b) public news reports about the EC's investigation of manipulation in the Brent Crude oil market; (c) the following public reports: the Report by the International Energy Agency ("IEA"), International Energy Forum ("IEF"), Organization of the Petroleum Exporting Countries ("OPEC") and International Organization of Securities Commissions ("IOSCO") to G20 Finance Ministers regarding oil price reporting agencies; IOSCO's consultation report on the functioning and oversight of oil price reporting agencies; and IOSCO's final report on principles for oil price reporting agencies; (d) public comments by market participants in response to IOSCO's consultation report on functioning and oversight of oil price reporting agencies; (e) public news reports of whistleblower allegations to the United Kingdom's Office of Fair Trading ("OFT") and Financial Services Authority ("FSA") of manipulated oil prices; and (f) additional investigation including that reflected in specific allegations.

[2] "Brent Crude Oil Futures Contracts" include Brent Crude oil futures contracts traded on IntercontinentalExchange, Inc. ("ICE") or New York Mercantile Exchange ("NYMEX"), as well as Brent Crude oil futures derivatives contracts traded on ICE or NYMEX whose value is based on the prices of physical (spot) Brent Crude oil or Brent Crude oil futures contracts.

assessments are used by market participants throughout the United States, and elsewhere, to price and settle such deals and contracts.

3.      Platts' physical (spot) Brent Crude oil price assessments are a benchmark that is used to price and allocate oil and its refined products, including gasoline, diesel and jet fuel, among consumers and others.  These price decisions are very important.  They have a direct and immediate impact on the overall strength of the economy and the economic health of individual citizens.

4.      Provided that Platts' physical (spot) Brent Crude oil price assessments are the result of non-manipulated bid, offer and transaction information submitted by market participants, including Defendants, economic theory holds that such prices will value, allocate and ration these energy resources more efficiently than centralized planners in a non-free market economy.

**Manipulation.**

5.      During the period from and including January 1, 2002 through such time as the anticompetitive effects of Defendants' unlawful conduct ceased (the "Class Period"), the Defendants acted to intentionally manipulate the prices of Brent Crude Oil Futures Contracts by their deliberate reporting of inaccurate, misleading and false physical (spot) Brent Crude oil bid, offer and transaction information to Platts, in violation of Section 9(a) of the Commodity Exchange Act ("CEA"), as amended, 7 U.S.C. § 13.  Also during the Class Period, Defendants combined, conspired and agreed to restrain trade in, fix, and manipulate physical (spot) Brent Crude oil prices and Brent Crude Oil Futures Contract prices and monopolized the physical (spot) Brent Crude oil market in violation of Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1, 2.

**Means**.

6.    Defendants' manipulation and unlawful anticompetitive conduct in both the physical (spot) Brent Crude oil market and Brent Crude Oil Futures Contracts market was implemented through their deliberate reporting of inaccurate, misleading and false physical (spot) Brent Crude oil bid, offer and transaction information to Platts.  Because Platts' physical (spot) Brent Crude oil price assessments are used to price and settle both physical (spot) Brent Crude oil contracts and related futures and derivatives contracts, false reporting of physical (spot) Brent Crude oil prices to Platts undermines the entire pricing mechanism for the Brent Crude oil market. *See, e.g., In re Natural Gas Commodity Litig.,* 337 F. Supp. 2d 498, 509 (S.D.N.Y. 2004) (on motion to dismiss, upholding allegations that defendants falsely reported trade data in the physical natural gas market to manipulate prices in the natural gas futures market).

**Summary of Defendants' Overall Manipulation**.

7.    As is alleged in detail in ¶¶ 102-13, Defendants' overall manipulation included at least the following:

   a.   Defendants deliberately reported inaccurate, misleading and false physical (spot) Brent Crude oil bid, offer and transaction information to Platts;

   b.   Defendants placed large hypothetical trades, offering huge volumes of Brent Crude oil for sale and then withdrawing the offer – a process known as "spoofing."  Defendants reported such transactions to Platts, causing Platts' physical (spot) Brent Crude oil price assessments to reflect inaccurate, misleading and false market data; and

   c.   Defendants conspired with or otherwise obtained Platts' cooperation to exclude other market participants from reporting bid, offer and transaction information to Platts for use in Platts' physical (spot) Brent Crude oil price assessment process.

**Effects**.

8.      Through their deliberate reporting of inaccurate, misleading and false physical (spot) Brent Crude oil bid, offer and transaction information to Platts, Defendants intentionally and directly (1) caused the prices of physical (spot) Brent Crude oil to be artificial; and (2) caused the prices of Brent Crude Oil Futures Contracts to be artificial.  The Platts' published prices of physical (spot) Brent Crude oil were used by market participants as the primary reference point for valuing physical (spot) Brent Crude oil and Brent Crude Oil Futures Contracts.  Defendants' deliberate reporting of inaccurate, misleading and false Brent Crude oil bid, offer and transaction information to Platts sent false signals to and greatly misled market participants with respect to prices in not only the physical (spot) Brent Crude oil market, but also in the Brent Crude Oil Futures Contracts market as well.

9.      As a direct and foreseeable result of Defendants' manipulation and other unlawful conduct during the Class Period, Plaintiff and the members of the Class transacted Brent Crude Oil Futures Contracts at artificial prices, were deprived of a lawful market during the Class Period, were injured in their business or property, and suffered actual damages.

## JURISDICTION AND VENUE

10.      Brent Crude oil is a "commodity" and is the "commodity underlying" Brent Crude Oil Futures Contracts, as those terms are defined and used in Section 1a(9) and 22 of the CEA, 7 U.S.C. §§ 1a(9) and 25(a)(1)(D), respectively.

11.      This action arises under Section 22 of the CEA, 7 U.S.C. § 25, and Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1 and 2.

12.   This Court has jurisdiction over this action pursuant to Section 22 of the CEA, 7 U.S.C. § 25(c), Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, and 28 U.S.C. §§ 1331 and 1337.

13.   Venue is proper in this District pursuant to Section 22 of the CEA, 7 U.S.C. § 25(c), Sections 4, 12 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22 and 26, and 28 U.S.C. § 1391(b), (c) and (d).  One or more of the Defendants resided, transacted business, were found, or had agents in the Southern District of New York, and a substantial part of the events or omissions giving rise to the claims asserted herein occurred in the Southern District of New York.  Defendants' unlawful acts manipulated the prices of NYMEX Brent Crude oil futures contracts which were traded in this District in which the NYMEX is located, at One North End Avenue, New York, New York.  Further, Platts' global headquarters are located in New York, New York.

14.   Brent Crude oil and Brent Crude Oil Futures Contracts are each a commodity that trades in United States interstate commerce.  Defendants' anticompetitive conduct and manipulation of physical (spot) Brent Crude oil and Brent Crude Oil Futures Contract prices had direct, substantial, and reasonably foreseeable effects in the United States, and on Plaintiff and members of the Class.  Brent Crude Oil Futures Contracts are traded domestically on NYMEX and on ICE, which is accessible within the United States.  Defendants, as sophisticated Brent Crude oil market participants, knew, or had good reason to know, that physical (spot) Brent Crude oil prices published and compiled by Platts are disseminated in the United States, and are used to price, settle, and benchmark Brent Crude Oil Futures Contracts and/or other Brent Crude oil derivative contracts traded in the United States.  For these reasons, Defendants knew that misreporting the spot price of physical Brent Crude oil to Platts, as well as other manipulative and collusive conduct in the Brent Crude oil market, would, and did, have direct, substantial and

5

reasonably foreseeable effects in the United States, including, without limitation, on the prices of Brent Crude Oil Futures Contracts.

15.    Defendants, directly and indirectly, singly and in concert, made use of the means and instrumentalities of transportation or communication in, or the instrumentalities of, interstate and/or international commerce, or of the mails in connection with the unlawful acts and practices and courses of business alleged in this Complaint.

## PARTIES

16.    Plaintiff Patricia Benvenuto, a Phoenixville, Pennsylvania resident, traded Brent Crude Oil Futures Contracts during the Class Period at artificial prices proximately caused by Defendants' unlawful manipulation and anticompetitive conduct as alleged herein.  Plaintiff was deprived of transacting in a lawful, non-manipulated, competitive market in Brent Crude Oil Futures Contracts, and was otherwise injured in her business or property as a direct and proximate result of Defendants' unlawful conduct.

17.    Defendant BP is a multinational oil and gas company headquartered in London, England, United Kingdom. BP also has extensive United States operations, with approximately 25% of all BP employees located in the United States.  BP operates more than 4,000 miles of pipeline in the United States, and there are more than 11,000 BP-branded retail locations in the United States.[3] BP's North America headquarters are located in Houston, Texas.

18.    Defendant Shell is a multinational oil and gas company headquartered in The Hague, Netherlands. Like BP, Shell has extensive United States operations.  Shell operates in all 50 states and employs more than 22,000 people in the United States.  Shell's North America headquarters are located in Houston, Texas.

---

[3] This number includes both BP and Atlantic Richfield Company ("ARCO") retail locations, as BP acquired ARCO in 2000.

19.    Defendant Statoil is a Norwegian oil and gas company headquartered in Stavanger, Norway.  Statoil was formed by the 2007 merger of Statoil with the oil and gas division of Norsk Hydro.  Statoil maintains offices in the United States, including in Stamford, Connecticut, Washington, D.C. and Houston, Texas.

20.    John Doe Defendants Nos. 1-50 are other entities or persons, including oil, gas or other energy companies as well as other co-conspirators whose identities are currently unknown to Plaintiff.  The John Doe Defendants participated in, furthered, and/or combined, conspired, or agreed with others to perform the unlawful acts alleged herein, including the restraint of trade, monopolization, and manipulation of physical (spot) Brent Crude oil and Brent Crude Oil Futures Contract prices.

## NON-PARTY CO-CONSPIRATOR

21.    Platts, a leading provider of benchmark price assessments for energy markets, is headquartered at 2 Penn Plaza, New York, New York 10121-2298.  Platts is included herein as a non-party co-conspirator.

## AGENTS AND UNNAMED CO-CONSPIRATORS

22.    Various other entities and individuals, including, but not limited to, subsidiaries and/or affiliates of the Defendants, participated as co-conspirators and manipulators in the acts complained of and performed acts and made statements that aided and abetted and furthered the unlawful conduct alleged herein. The unnamed co-conspirators, along with the above-named Defendants, performed, participated in, furthered, and/or combined, conspired, or agreed with others to perform the unlawful acts alleged herein, including the restraint of trade, monopolization, and manipulation of the prices of physical (spot) Brent Crude oil and Brent Crude Oil Futures Contracts.

## BACKGROUND

### I.    Brent Crude Oil: The Physical Trading Market

23.    Brent Crude is a major trading classification of light sweet crude oil comprised of four

types of North Sea crude oil:  (1) Brent Blend; (2) Forties Blend; (3) Oseberg Blend; and (4)

Ekofisk Blend.  Together, Brent, Forties, Oseberg and Ekofisk are known by market participants

as "Brent Crude" or "BFOE."



Source:  ExxonMobil

24.    BFOE producers take physical possession of Brent Crude at one of the four terminals

where Brent Crude is delivered by nominating a suitable oil tanker or vessel during a scheduled

three-day window, which depends on production volume and equity (*i.e.*, interest) participation

in the oilfields.  Brent Blend is delivered at terminal Sullom Voe.  Forties Blend is delivered at

terminal Hound Point.  Oseberg Blend is delivered at terminal Sture and Ekofisk Blend is

delivered at terminal Teeside.



Source:  Joel Hanley, *Assessing the Benchmarks*, PLATTS EUROPEAN CRUDE OIL (Jan. 2008).

25.    The BFOE oilfields in the North Sea produce a physical daily output of approximately

900,000 barrels each day.  Production of BFOE has declined by about 35 percent since 2007.



Source: Bloomberg

26.    Despite declining production, Brent Crude is still the leading global price benchmark for

Atlantic basin crude oil, and it is used as the reference price for between 60 to 70 percent of the

international physical oil trade.[4]

---

[4] Mike Davis, *Oil Price Benchmarks in International Trade*, OXFORD ENERGY FORUM (Issue 87)
(Feb. 2012), at 14.



Source:  ICE

27.    The underlying physical Brent Crude oil market consists of (1) Dated Brent; and (2) Cash or Forward Brent, otherwise known as the 25-day Brent or BFOE.  The terms of trading in the physical Brent Crude oil market are governed by a document known as the SUKO90 contract, with SUKO standing for Shell UK Oil Company, a subsidiary of Defendant Shell, and one of the largest BFOE producers and the custodian of this contract.[5]

28.    BFOE producers, including Defendants, know ahead of time the volume of crude oil they will receive during specific months based on production volumes.  Such crude oil is assigned a

---

[5] *Shell Trading*, SHELL GLOBAL, http://www.shell.com/global/products-services/solutions-for-businesses/shipping-trading/about-shell-trading.html (last visited May 29, 2012); *Shell's shock move jumpstarts oil benchmark reform debate*, REUTERS, Feb. 20, 2013, http://uk.reuters.com/article/2013/02/10/uk-shell-bfoe-idUKBRE91906X20130210.

delivery date to occur within a three-day window.  This three-day window is known about 25 days in advance.[6]  Brent Crude oil that has already been assigned a delivery date (within a three-day window) is referred to as Dated Brent.

29.    Cash or Forward Brent is the term for Brent Crude oil that has not been assigned a loading date (*i.e.*, it does not have a three-day window).   Cash or Forward Brent is traded for speculative or hedging purposes.

30.    When a BFOE producer sells crude oil in the forward market (*i.e.*, more than 25 days prior to delivery), the SUKO90 contract covers the precise mechanism in which the forward oil becomes dated physical oil.  The BFOE producer/seller must provide the buyer with at least 25 days' notice of the three-day window.  When the notice period expires (*i.e.*, the three-day window is less than 25 days away), the parcel of oil becomes dated.

31.    Price Reporting Agencies ("PRAs") assess daily the Dated Brent price.  Platts is the leading PRA in the price assessment of oil products, particularly crude oil.  Platts' Dated Brent price setting is the leading global benchmark for Brent Crude oil.

---

[6] Originally, the Dated Brent market was assessed on a 7 to 15 day range, *i.e.,* cargoes loading 7 to 15 days forward. The assessment period was extended by Platts to 10 to 21 days in 2002 and to its current 10 to 25 day assessment period on January 6, 2012.



Source: Platts

32. The price correlation between Dated Brent and some of the most widely known crude oils from around the world is almost perfect.

| Crude oil | Origin | Correlation |
|-----------|--------|-------------|
| Bonny Light | Nigeria | 0.999 |
| Cabinda | Angola | 0.999 |
| Escravos | Nigeria | 0.999 |
| Suez | Egypt | 0.998 |
| Iranian Light (to South Korea) | Iran | 0.996 |
| Oman | Mid East | 0.997 |
| Urals (to North West EU) | Former Soviet Union | 0.999 |
| Maya | South America | 0.991 |

Source: Bloomberg

## II.   Brent Crude Oil:  The Futures Market

13

33.     A commodity futures contract is a standardized bilateral executory agreement for the purchase and sale of a particular commodity. In the context of futures trading, a commodity (here, Brent Crude oil) is the underlying product upon which a futures contract is based.

34.     The bilateral aspect of the futures contract is that there is a seller and a buyer.

35.     The sellers are one-half of the bilateral futures contract and one-half of the commodity futures market. They are referred to as "shorts."

36.     The buyers are the other one-half, and are referred to as "longs."

37.     The key for a successful futures market is the concept of "convergence."  This is the process that links the futures market to the underlying physical commodity.  The process is accomplished by a delivery mechanism.  "Delivery" allows participants in the futures market holding open "long" or "short" positions after the contract expires to exchange their futures position for the underlying physical commodity.  Therefore, at expiry, the futures contract and the commodity are worth the same.

   **A.  ICE**

38.     The International Petroleum Exchange ("IPE") at one time was one of the world's largest energy futures and options exchanges.  Its flagship commodity, Brent Crude oil, was a world benchmark for oil prices.  The IPE was acquired by ICE in 2001.  Brent Crude oil futures contracts were traded via open outcry[7] on the floor of the IPE until April 7, 2005, when its name was changed to ICE Futures and all trading in Brent Crude oil futures contracts was shifted onto an electronic trading platform. Today, ICE Futures is the second largest regulated energy futures exchange in the world.  ICE Futures hosts more than 50% of the world's crude and refined oil futures trading.

---

[7] Open outcry is a method of public auction for making bids and offers in the trading pits of the futures exchange.

39.    The ICE Brent Crude oil futures contract is traded on ICE Futures Europe and executed on several platforms, including the WebICE trading platform, which is available in more than 70 countries, including the United States.  ICE Futures Europe is regulated by the U.K. Financial Conduct Authority, with oversight by the United States Commodity Futures Trading Commission ("CFTC") for linked contracts.[8]

40.    ICE Brent Crude oil futures are traded in 1,000 barrel contracts and quoted in United States dollars and cents per barrel.

41.    The market for ICE Brent Crude oil futures contracts is the largest crude oil futures market in the world, with daily average transaction volumes currently exceeding 670 million barrels per day.  The size of the ICE Brent Crude oil futures contract market is larger than the physical market by a factor of 560X.[9]

---

[8] Ice Futures Europe and its predecessor, IPE, have operated in the United States since 1999 pursuant to CFTC staff no-action relief. *See* CFTC Letter No. 99-69 (Nov. 12, 1999); CFTC Letter No. 03-17 (Apr. 14, 2003).  Since 2008, ICE Futures Europe's no-action has been conditioned on, among other things, the requirement that ICE Futures Europe implement position limit requirements for its NYMEX-linked contracts that are comparable to the position limits that NYMEX applies to its contracts.  *See* CFTC Letter No. 08-09 (June 17, 2008); CFTC Letter No. 09-37 (Aug. 20, 2009).

[9] Based on a total of 147 million contracts for 2012 and 260 trading days. *See The Growth of Brent Crude Oil*, https://www.theice.com/publicdocs/ICE-Brent_Infographic.pdf (last accessed June 4, 2013); *Daily Volumes for Ice Brent Crude Futures (Monthly)*, ICE REPORT CENTER, https://www.theice.com/marketdata/reports/ReportCenter.shtml#report/26 (last accessed May 29, 2013).



Source:  ICE Report Center

42.    The prices of ICE Brent Crude oil futures contracts are based on the prices in the

underlying physical BFOE market.

43.    Trading in ICE Brent Crude oil futures contracts terminates at the end of the designated

settlement period on the Business Day (a trading day which is not a public holiday in England

and Wales) immediately preceding: (i) either the 15th day before the first day of the contract

month, if such 15th day is a Business Day; or (ii) if such 15th day is not a Business Day, the next

preceding Business Day. [10]

---

[10] The ICE Brent Crude oil futures contract was developed in 1988 when the Brent Crude oil
physical market was trading on a 15-day basis. The expiry calendar established at that point,
which continues today for existing ICE Brent Crude oil futures, reflected the 15-day timetable.

44.   ICE Brent Crude oil futures contracts are deliverable contracts based on "exchange for physical" ("EFP") delivery with an option to cash settle.  As explained by ICE:  "The ICE Brent futures contract is linked to forward BFOE contracts and hence the underlying Dated Brent market by the Exchange for Physical (EFP) mechanism with an option to cash settle."[11]

45.   The EFP is akin to a switch between positions of two participants in the futures and forward markets:

> It transfers the position of a market participant on the ICE future market to the Brent forward market, therefore giving an option for a subsequent physical delivery.  The forward position of the second participant is, in turn, transferred to ICE.  Through EFPs, a strong link is introduced between physical and future markets. . . . We see the current market practice of big players having both instruments in their portfolios and arbitraging between futures and forwards as the main reason for the link between physical and financial markets.[12]

46.   The EFP mechanism is a tool commonly used in futures markets to allow participants to conveniently link their physical and futures market transactions.[13]

47.   When an ICE Brent Crude oil futures contract holder opts for cash settlement, ICE states

> [T]he contract settles against the ICE Brent Index price for the day following the last trading day of the Brent futures contract.  At expiry of a Brent futures contract, the index price is based on the average value of BFOE cash cargoes on expiry day.  The index is also calculated by the exchange every day.[14]

---

Existing ICE Brent Crude oil futures contracts therefore currently expire ten days after BFOE contracts have started to go "wet," *i.e.,* to turn into specific Dated Brent contracts with respect to the contract delivery month in question.  In response to Platts' extending its assessment period to 10-25 days, ICE launched the ICE Brent NX futures contract, which has an expiry calendar based on the 25-day BFOE market and therefore aligns the futures expiry calendar with the physical BFOE market.

[11] *Ice Brent FAQ* (Jan. 2013), https://www.theice.com/publicdocs/futures/ICE_Brent_FAQ.pdf.

[12] Christopher Barret, Oxford Energy Comment, *Brent prices: Impact of PRA methodology in price formation*, THE OXFORD INST. FOR ENERGY STUD. (Mar. 2012), at 18.

[13] *Exchange Futures for Physical (EFPs) for ICE Brent Futures*, www.theice.com/publicdocs/futures/ICE_Brent_EFP_Explained.pdf (last accessed May 29, 2013).

[14] *Ice Brent FAQ* (Jan. 2013), https://www.theice.com/publicdocs/futures/ICE_Brent_FAQ.pdf.

48.   The ICE Brent Index price represents the average price of trading in the 25 day BFOE

market in the relevant delivery month as reported and confirmed by industry media.  Only

published cargo size (600,000 barrels) trades and assessments are taken into consideration.  The

ICE Brent Index is an average of the following elements:

- A weighted average of first month cargo trades in the 25 day BFOE market;

- A weighted average of second month cargo trades in the 25 day BFOE market plus a straight average of the spread trades between the first and second months; and

- A straight average of designated assessments published in media reports.[15]

**B.   NYMEX**

49.   NYMEX is a designated contract market under Section 5(b) of the CEA, 7 U.S.C. § 7(b).

NYMEX is the world's largest physical commodity futures exchange and the preeminent forum

for energy and precious metals.

50.   The NYMEX Brent Crude oil futures contracts are based on the Brent Crude oil futures

contracts offered on ICE Europe.  In other words, the settlement price of the Brent Crude oil

futures contract that trades on NYMEX is the price of the ICE Brent Crude oil futures contract

traded on ICE.

51.   NYMEX futures contracts priced, settled or benchmarked to Brent Crude oil include: (i)

the Brent Crude Oil Last-Day Futures (BZ); (ii) Brent Financial Futures (CY); and (iii) Brent

Crude Oil Futures (BB).

52.   The size of the (i) Brent Crude Oil Last-Day Futures (BZ); (ii) Brent Financial Futures

(CY); and (iii) Brent Crude Oil Futures (BB) contracts is 1,000 barrels.

---

[15] *Id.*

53.   Trading in NYMEX Brent Crude Oil Last-Day Futures (BZ), Brent Financial Futures (CY), and Brent Crude Oil Futures (BB) is subject to the rules and regulations of NYMEX, and prices are quoted in United States dollars and cents per barrel.

54.   These contracts are transacted electronically on the Chicago Mercantile Exchange ("CME") Globex[16] and CME ClearPort trading platforms. Additionally, the Brent Crude Oil Last Day Futures (BZ) and the Brent Financial Futures (CY) trade through open outcry at NYMEX in New York.

55.   Trading in NYMEX Brent Crude Oil Last-Day Futures (BZ) terminates on the same termination day as the ICE Brent Crude oil futures contract for the delivery month, *i.e.*, on the business day immediately preceding the 15th day prior to the first day of the delivery month, if such 15th day is a banking day in London. If the 15th day is a nonbanking day in London (including Saturday), trading terminates on the business day immediately preceding the first business day prior to the 15th day.

56.   Trading in NYMEX Brent Financial Futures (CY) terminates on the last business day of the contract month.

57.   Trading in NYMEX Brent Crude Oil Futures (BB) terminates one business day prior to the termination of the ICE Brent Crude oil futures contract, *i.e.*, two business days before the 15th calendar day prior to the first day of the delivery month, if the 15th calendar day is not a holiday or weekend in London. If the 15th calendar day is a holiday or weekend in London, trading shall end three business days prior to the last business day preceding the 15th calendar day.

---

[16] Globex is an electronic trading platform owned by NYMEX's parent company, the CME Group.

19

58.    The daily settlements for NYMEX Brent Crude Oil Futures (BB) and Brent Crude Oil Last

Day Futures (BZ) are equivalent to the settlements in the corresponding ICE Brent Crude oil

futures contract.

59.    Final settlement for the NYMEX Brent Crude Oil Futures (BB) contract is based on its

Floating Price. The Floating Price is equal to the ICE Brent Crude oil futures 1st nearby contract

settlement price on the penultimate trading day for the delivery month.

60.    Final settlement for the NYMEX Brent Crude Oil Last-Day Futures (BZ) contract is based

on its Floating Price. The Floating Price is equal to the ICE Brent Index price as published one

day after the final trading day of the contract month.

61.    Final settlement for the NYMEX Brent Financial Futures (CY) contract is based on its

Floating Price. The Floating Price is equal to the arithmetic average of the ICE Brent Crude oil

futures 1st nearby contract settlement prices for each business day that it is determined during

the contract month.  But on the last day of trading for the expiring ICE Brent Crude oil futures

contract, the settlement price of the ICE Brent Crude oil futures 2nd nearby contract is used.

**III.    Brent Crude Oil Spot and Futures Prices Are Inextricably Linked**

62.    The Brent Crude Oil Futures Contracts market is inextricably linked to the physical (spot)

Brent Crude oil market and thus to Platts' pricing (*see* ¶¶ 37, 42, 44-48, 51).  Price movements in

the physical (spot) market can and do cause price movements in the futures market.

63.    In particular, Brent Crude oil futures traders depend on the physical (spot) prices published

by PRAs.  Platts is the preeminent PRA for price discovery and for assessing price risks in the

Brent Crude oil market.  An increase in the physical (spot) price published by Platts signals

either stronger demand or weakened supply, and futures traders take account of both price

movements and changes in the supply/demand balance when conducting their futures trading. This price impact is well known and expected.

64.    Brent Crude Oil Futures Contract prices derive their valuation from spot transactions. The spot market is the first point in a commercial transaction. Over time, and based on full information in physical and futures markets, physical (spot) Brent Crude oil and futures prices are sympathetic and reflect the same fundamental assessment by participants in both markets of the value underlying physical Brent Crude oil. (*see* ¶ 37).

65.    In particular, the EFP mechanism employed in ICE Brent Crude oil futures contracts creates a direct link between physical (spot) Brent Crude oil prices and ICE Brent Crude oil futures contract prices.  The expiration of a Brent Crude oil futures contract into a physical position via the EFP mechanism (*see* ¶¶ 44-46) results in the convergence of price when the physical (spot) price sets the futures expiration price.

66.    The strength of the convergence mechanism is demonstrated by the graph below, which shows an almost perfect (.999) correlation between the prices of Dated BFOE and the front month ICE Brent Crude oil futures contract.[17]

---

[17] The "front month ICE Brent Futures contract" refers to the contract month with an expiration date closest to the current date. It is the shortest duration contract that could be purchased in the futures market.



Source:  Bloomberg.

67.    As explained by the Commodities Working Group of the Global Financial Markets

Association ("GFMA") in response to the International Organization of Securities Commissions'

("IOSCO") consultation on functioning and oversight of oil price reporting agencies,

> The direct and indirect relationships result in PRA assessments having a very high
> correlation with futures prices for a large proportion of oil products.  This allows
> the effective hedging of PRA indexed oil purchases and sales on exchanges and is
> part of the mechanism whereby physical oil consumption and production
> fundamentals translate to exchange prices. . . . [T]here is a strong and complex

relationship between the two.[18]

68.     When these high correlations are disrupted by the manipulation of prices (creating false values/prices), *i.e.,* a manipulation of the Platts' physical (spot) Brent Crude oil price assessment process, it inevitably has pricing effects that ripple throughout the Brent Crude Oil Futures Contracts market.

<u>**SUBSTANTIVE ALLEGATIONS**</u>

I.      <u>**Platts is the Overwhelmingly Dominant PRA for Determining the Price of Physical (Spot) Brent Crude Oil**</u>

69.     Because most physical (spot) Brent Crude oil is traded in over-the-counter, non-public deals between producers, traders and refiners, where transaction details are not readily observable, PRAs, in particular Platts, play the central role in establishing and reporting prices of physical (spot) Brent Crude oil.

70.     Platts' Dated Brent price assessment is the leading global benchmark for physical (spot) Brent Crude oil.  Total SA ("Total"), Europe's third-biggest oil company, has stated that as much as 80% of all crude and oil-product transactions are linked to reference prices, particularly those published by Platts.  Total estimates that Platts dominates the PRA market, with 90 to 95 percent of all transactions on crude oil linked to Platts' published price assessments, and 85 to 90 percent of all transactions on products linked to Platts' price assessments.

71.     Platts maintains its dominance as the preeminent PRA for pricing physical (spot) Brent Crude oil by virtue of the fact that it is very difficult for users to switch from using Platts' physical (spot) Brent Crude oil price assessments to those of another PRA.  The International Organization of Securities Commissions ("IOSCO"), upon polling PRA users, found:

---

[18] Simon Lewis, Commodities Working Group of GFMA, *Re: Public Comment on Functioning and Oversight of Oil Price Reporting Agencies*, at 5 (Apr. 4, 2012) (hereinafter, "GFMA Response").

Users, which express discontent with a particular PRA, comment that they cannot simply change to another PRA benchmark since to do so would necessitate moving away from the current concentrated usage of the leading benchmark and thus expose the migrating user to an unwanted basis risk in that particular market. It appears, on the basis of these comments, that users believe they are forced to continue to suffer unsatisfactory decisions made by a particular PRA, since that is preferable to exposing themselves to basis risk in the market. Some of the contracts that reference PRA benchmark prices can have maturities of twenty years or more, so the implications of an inability to change from an unsatisfactory benchmark can be significant and long lasting.[19]

72. In fact, "[e]ven some of Platts' most vehement detractors do not feel able to cease using Platts" because "they have long term legacy contracts based on Platts, and the short and long term derivative instruments trading the market are also based on Platts."[20]

## II.    Platts' Pricing Process is Opaque and Dominated by a Small Number of Market Participants, Including Defendants

73. Platts uses a Market-On-Close ("MOC") methodology in establishing and reporting European crude oil prices, including physical (spot) Brent Crude oil. Platts' MOC methodology is based upon bids, offers and transactions for physical (spot) Brent Crude oil (as reported to Platts) that take place during the 30 to 45 minutes before the close of the market (generally 4:00 p.m. to 4:30 p.m. London time). This 30 to 45 minute period of time is critical and is referred to as the "Platts Window." During the Platts Window, market participants send their bid, offer and transaction details to Platts' editors via squawk box, telephone, e-mail and instant messenger. Since 2007, bids and offers can also be placed in a trading platform (*i.e.*, computer software) known as the eWindow. The platform interface was developed by ICE for Platts and it is similar in appearance and features to the ICE trading platform, but run under Platts' rules.

---

[19] Technical Committee of IOSCO, *Functioning and Oversight of Oil Price Reporting Agencies*, at 21, Doc. No. CRO4/12 (Mar. 2012) (hereinafter, "IOSCO Consultation Report").
[20] IEA, IEF, OPEC and IOSCO, *Oil Price Reporting Agencies Report to G20 Finance Ministers*, at 10 (Oct. 2011) (hereinafter "Oil PRAs Report").

74.    Market participants can adjust their bids and offers during the Platts Window subject to Platts' guidelines.  Market participants who fail to declare their intention to submit bids and offers during the Platts Window may not submit bids and offers during the Platts Window, but may still choose to accept a bid or an offer posted during the Platts Window.  Following the close of the market (generally 4:30 p.m. London time), Platts' editors examine the bids, offers, and transactions for physical (spot) Brent Crude oil that took place during the Platts Window and use that data to establish an end-of-day (or MOC) physical (spot) Brent Crude oil price.

75.    According to Platts, the goal of the MOC methodology is to reflect market prices at the end of the price assessment period.

76.    Platts' MOC methodology, while based on offer, bid and transaction data reported by market participants, also relies on the subjectivity of Platts' editors.

77.    The International Organization of Securities Commissions has commented on the subjectivity involved in oil price assessments by PRAs, including Platts:

> The methodologies [used by PRAs to assess oil prices] often require the application of judgment, particularly when data are extrapolated or when there is a paucity of reported transactions (i.e. some methodologies are not transaction-based).  For example, judgment is used by PRAs in determining whether to include or exclude bids, offers and trades in assessments and in determining how to extrapolate prices from a submitted data set. . . .  The existence of judgment in the assessment process also provides an avenue for potential preferential treatment of traders (particularly where bids, offers and transactions are not anonymous) . . . ."[21]

78.    Platts primarily considers only deals done in the Platts Window, and only those deals done on the standard basis which it specifies.  However, this strictly limits the number of deals available for Platts to analyze in its physical (spot) Brent Crude oil price setting process.  When

---

[21] IOSCO, *Principles for Oil Price Reporting Agencies*, at 32, Doc. No. FR06/12 (Oct. 5, 2012) (hereinafter "IOSCO Principles").

there are no deals done, Platts editors use their own judgment to arrive at price assessments that are supposed to be objectively reasonable.

79.   Additionally, even when deals are done, Platts "may choose to ignore them if it considers that the deals . . . do not represent the 'true' market price, or if a party to the transaction is currently sanctioned by Platts and excluded from the database."[22]

80.   As noted by one market participant, "PRAs have a substantial amount of discretion in applying their methodologies e.g. they can decide to exclude trades from their price assessments. Further, they do not have to account for the basis on which they exercised their discretion."[23]

81.   This is because PRAs', including Platts', complaint resolution processes lack transparency. Market participants that believe Platts has incorrectly or unfairly sanctioned them have little recourse because Platts does not have an independent formal complaint procedure.  In fact, in response to questioning about their independent formal complaints procedures, four PRAs polled, including Platts, made the observation "that if the subscribers were unhappy with the prices published by the PRAs they could take their business elsewhere."[24]

82.   Market participants have publicly disagreed, and called for PRAs to have independent formal complaint procedures.  For example, oil company Total has stated

> The PRAs need to assure that they offer their clients a formal and expedited
> process for handling disagreements, including a process of appeals that would call
> in an outside arbiter (Ombudsman).  It is unacceptable for the PRAs to hide
> behind "journalistic independence" as an excuse for not dialoguing with the actors
> in the oil market.[25]

---

[22] Oil PRAs Report at 9.
[23] GFMA Response at 4.
[24] Oil PRAs Report at 12.
[25] Total Oil Trading SA, *Functioning and Oversight of Oil Price Reporting Agencies*, at 5 (Aug. 24, 2012) (hereinafter "Total Reply").

83.     Platts' methodology for determining which market participants are allowed to transact in the Platts Window is similarly opaque.

84.     For example, Hungarian ethanol producer Pannonia Ethanol ("Pannonia") complained to the EC last year about Platts' requirements for new market participants who wish to transact in the Platts Window.  Pannonia explained, "[w]e kept getting list after list of more things we had to do to get into the window.  Platts kept saying they were exercising 'editorial discretion' and never gave us a definitive reason why they weren't letting us in the window."[26]

85.     Platts' opaque price assessment process is particularly exacerbated by the fact that the Platts Window is dominated and controlled by a small number of market participants, including Defendants.

86.     In part, this comes from the fact that there are few market participants large enough to participate in Platts' price assessment process.  Unlike the Brent Crude oil futures contract, which trades in 1,000 barrel cargoes, Platts requires participants in the MOC assessment process to trade in 600,000 barrel cargoes, or at a minimum 100,000 barrel partial cargoes.  This keeps small players out of the Platts Window and Platts' price assessment process.

87.     Between 2007 and 2010, the number of market participants in the Platts' physical (spot) Brent Crude oil price determination process has ranged from only 4 to 12 on average.[27]  Large oil companies with equity interests in the BFOE oilfields, like Defendants BP, Shell and Statoil, are

---

[26] Peg Mackey, *Hungarian ethanol firm says it alerted EU over Platts pricing*, REUTERS,  May 16, 2013, http://newsandinsight.thomsonreuters.com/Legal/News/2013/05_-_May/Hungarian_ethanol_firm_says_it_alerted_EU_over_Platts_pricing/.

[27] Bassam Fattouh, *An Anatomy of the Crude Oil Pricing System*, THE OXFORD INST. FOR ENERGY STUD. (Jan. 2011), at 41, http://www.oxfordenergy.org/wpcms/wp-content/uploads/2011/03/WPM40-AnAnatomyoftheCrudeOilPricingSystem-BassamFattouh-2011.pdf.

some of the largest buyers and sellers in the BFOE market, and thus constitute dominant players in the Platts Window.

**IV.   The Platts Price Assessment Process is Susceptible to Manipulation**

88.   In 2011, under pressure to curb speculation blamed for huge swings in the oil market, the Group of 20 ("G20") top economies asked IOSCO to look at the role of PRAs, including Platts, in the market.

89.   In March 2012, IOSCO published its preliminary report in response to the G20 request, titled "Functioning and Oversight of Oil Price Reporting Agencies."

90.   The IOSCO report highlighted characteristics of PRAs, including Platts, which increase the likelihood of manipulation:

> a.   PRAs' assessments of oil prices are based on a very small number of trades, often less than five;
>
> b.   Because PRAs, like Platts, are only aware of the transactions which are reported to them, and PRAs do not contractually require participants in their price formation processes to submit all of their transactions, there is a potential for participants to selectively report so as to manipulate prices, *i.e.*, that participants will only submit those prices that will have an impact on PRA benchmarks in a particular direction; and
>
> c.   There is a risk that PRAs' benchmark prices can be manipulated by the submission of false prices or by over or understating the volume transacted.

91.   IOSCO sought responses to its preliminary report from market participants.

92.   In its response, the Consilience Energy Advisory Group Ltd. ("CEAG") agreed that PRAs' voluntary reporting mechanism opens the price assessment process to manipulation, "particularly when non-arm's-length deals could be reported to the PRAs or transacted on the Platts e-window

software as if they were on arm's length."[28]  CEAG also agreed that there was a risk of false

prices or transactions being reported to PRAs:  "[I]f two or more companies were to collude,

PRA assessments could be manipulated.  The short duration of the window, the small volume of

eligible trades and the fact that there may be offsetting deals that are carried out, but which are

not reported, leaves all the PRAs open to abuse."[29]

93.    In its response, the International Air Transport Association ("IATA") also noted PRAs'

potential for manipulation by market participants involved in the price assessment process.  The

IATA remarked that "[v]oluntary reporting of transactions allows market participants to include

or exclude trades according to what would work to their favor.  It can cause distortion of market

prices."[30]  The IATA went on to note that "there are concerns that the exclusion of pre-trading

window trades for consideration in price assessment . . . opens up the possibility for parties that

want to manipulate the price in their favor to do so by asking for reoffers (repeat transactions)

which annuls previous offers made in the trading window."[31]

94.    Of particular significance is the IATA's comment on market participants that own BFOE

oilfields:

> There is particular concern about the Brent/Forties market where the modest
> supply from the North Sea makes the price of Brent highly sensitive to minor
> supply glitches.  Market participants who are owners of the Various North Sea
> fields are able to capitalize on price-moving information that is available to them
> ahead of the market.[32]

---

[28] CEAG, *Response to IOSCO Consultation on the Functioning and Oversight of the Price Reporting Agencies*, at 7 (Mar. 30, 2012) (hereinafter "CEAG Response").

[29] *Id.* at 6.

[30] Malvyn Tan, IATA, *Comments on the Functioning and Oversight of Oil Price Reporting Agencies*, at 5 (Mar. 29, 2012) (hereinafter "IATA Comments").

[31] *Id.* at 4.

[32] *Id.* at 7-8.

95.    Defendants Shell, Statoil and BP all own large interests in BFOE oilfields.[33]

96.    Oil company Total, in its response to IOSCO's consultation, flatly stated that several times a year it encountered PRA estimates of market prices on key indices "out of line with our experience of the day and with the available information on which the price formation is based" and that "the published prices do not always represent those of the market . . . ."[34]

97.    On October 5, 2012, IOSCO published its final report in response to the G20 request, having gathered and analyzed the responses from market participants.  In the report, titled "Principles for Oil Price Reporting Agencies," IOSCO identified vulnerabilities that could, if not addressed by appropriate controls and policies, result in inaccurate assessed prices.  A major vulnerability listed was the ability of price assessment participants to selectively report data on a voluntary basis, which creates "an opportunity for manipulating the commodity market data submitted to PRAs."[35]  IOSCO explained that "[t]hese vulnerabilities also create the potential for manipulating the *physical oil market* data that are submitted to PRAs or exerting improper influence on the PRA's assessment processes in order to advantage a manipulator's *oil derivatives position*."[36]

98.    An additional reason for the susceptibility of Platts' physical (spot) Brent Crude oil price setting process to manipulation is the very nature of the Brent Crude oil market itself.  According

---

[33] The Brent oilfield is owned by Shell and Exxon Mobil pursuant to a joint venture, and continues to be operated by Shell.  Other streams that flow into the Brent Blend include the Magnus, of which BP owns 85 percent and the Cormorant, of which Shell owns 57 percent.  BP and Shell also both maintain significant equity positions in crude streams that feed into the Forties Blend.  Shell also owns 50 percent of the Gannet oil production, which feeds into the Ekofisk blend.  And Statoil is the operator of the Oseberg system and owns 49 percent of it, while also maintaining significant equity shares in other crude streams that feed into the Oseberg blend.

[34] Total Reply at 6 and 2.

[35] IOSCO Principles at 6.

[36] *Id.* at 28-29.

to Reuters, "Dated Brent has come under scrutiny from oil market analysts as overly reliant on increasingly small streams of North Sea crude oil production [in which Defendants hold substantial equity interests], which critics say leaves the Dated Brent price open to distortion and manipulation."[37]

99.    Indeed, Brent Crude oil production is below one million barrels per day, making it a relatively thin and illiquid market.

100.   Furthermore, and exacerbating the illiquidity issue, market data reported by Argus Media, a global energy PRA, shows that only about 50% of the BFOE production is traded "spot," which are the transactions PRAs, including Platts, use to assess Brent Crude oil prices.

101.   The potential for distortion and manipulation is heightened by Platts' MOC methodology. Only a very minor proportion of daily transactions are done during the Platts Window, compromising the accuracy of the Window itself, and the reliability of the MOC methodology in setting prices.[38]

## V.    Defendants Intentionally Manipulated Physical (Spot) Brent Crude Oil and Brent Crude Oil Futures Contract Prices

102.   Defendants purposefully conspired to and did manipulate physical (spot) Brent Crude oil and Brent Crude Oil Futures Contract prices in several ways, all of which involved manipulation of Platts' physical (spot) Brent Crude oil price setting process.  Defendants (i) colluded in the deliberate and systematic submission of false or misleading physical (spot) Brent Crude oil bid, offer and transaction data to Platts; (ii) engaged in spoof trading, wherein they placed large hypothetical trades and then withdrew the offers to manipulate the market; and (iii) conspired

---

[37] *Shell's shock move jumpstarts oil benchmark reform debate*, REUTERS, Feb. 8, 2013, http://www.reuters.com/article/2013/02/08/shell-bfoe-idUSL5N0B8GKC20130208.
[38] Fattouh, *supra* note 27, at 32.

with or obtained the cooperation of Platts to exclude other market participants from the MOC price setting process.

103.   Defendants were aided in their conspiracy to manipulate Platts' physical (spot) Brent Crude oil assessment process by virtue of their roles as key players in the industry:

- Defendants BP, Shell and Statoil all own significant equity interests in BFOE oilfields (*see* footnote 33);

- Defendant BP maintains a large equity position in, and operates the Ninian pipeline system which carries crude oil streams into the Brent Blend to the Suollom Voe terminal, which BP also operates, and in which BP and Shell have equity positions;

- Defendants BP, Shell and Statoil control pipelines that carry Brent Crude oil;

- Defendant BP also maintains total control of the Forties pipeline system, and the Hound Point terminal, where Forties is loaded;

- Defendant Statoil is the operator of the Oseberg pipeline system and owns nearly half of it; and

- Defendant Statoil also holds a 14 percent interest in the Sture terminal, the delivery point of the Oseberg blend.

104.   Defendants were further aided in their conspiracy to manipulate the Platts' physical (spot) Brent Crude oil price setting process by virtue of the fact they are the guardians of the contractual arrangements in the BFOE market.  Shell is the custodian of the SUKO90 contract, which governs the overall BFOE market (*see* ¶ 27).  Moreover, Platts requires participants in its MOC price assessment process to meet specific terms and conditions, including terms and conditions required by Defendants:

> [T]he bids/offers and transactions are recognized for assessment purposes provided they meet the following conditions: . . . Normally, Forties cargoes are

loaded under BP's terms and conditions, Brent cargoes are loaded under Shell's terms and conditions, Oseberg cargoes are loaded under Statoil's terms and conditions, and Ekofisk under ConocoPhillips' terms and conditions.[39]

105.  Defendants' entrenched and dominating presence in the Brent Crude oil supply chain provides them with superior information in terms of current and future BFOE production, which they can utilize to their advantage in the Platts' MOC price setting process.  Furthermore, Defendants' unlawful manipulation and conspiracy allowed them to pool their industry knowledge, such that each was in an even greater and superior position in terms of their knowledge of current and future BFOE production.

106.  The risk of price distortion in futures markets is exacerbated when market participants have control of physical infrastructure and access to better information, as is the case with Defendants BP, Shell and Statoil.  This risk is exemplified in the United States Federal Trade Commission's ("FTC") challenge to the BP-Amoco merger, based on fears that the control of physical infrastructure could lead to manipulation or squeezes in the West Texas Intermediate oil futures market.  The FTC stated that "a firm that controlled substantial storage . . . and pipeline capacity . . . would be able to manipulate NYMEX futures trading markets . . . ."[40]

107.  There are numerous ways in which Defendants are in a position to collude in the submission of false, inaccurate or misleading Brent Crude oil bid, offer and transaction data to Platts.  For example, because participation in Platts' MOC price assessment process is voluntary, and Defendants are under no contractual, legal or regulatory requirement to report transactions to Platts, Defendants had the ability and economic incentive to submit only those transactions to Platts that benefitted their own economic interests.  Additionally, through their collusion,

---

[39] Platts Methodology and Specifications Guide, *Crude oil methodology*, at 4, http://www.platts.com/methodology-specifications/oil (last updated May 2013).
[40] Complaint at 7, *In the Matter of BP Amoco P.L.C.*, Docket No. C-3938 (F.T.C.  Apr. 13, 2000).

Defendants were able to transact non-arm's length deals during the Platts Window as if they were at arm's length. Defendants were also able to collude to report false bid, offer and transaction data to Platts by, for example, reporting prices to Platts that were contrary to and different from prices Defendants quoted other market participants.

108. Another way by which Defendants were able to, and did, manipulate Platts' physical (spot) Brent Crude oil price assessment process was through spoof trading. Last year, a whistleblower oil trader contacted Robert Halfon, the Tory member of Parliament representing Harlow,[41] regarding oil price manipulation. The whistleblower explained that traders have tampered with oil prices by placing large hypothetical trades (*i.e.*, spoof trades), where huge volumes of oil are offered for sale and then withdrawn. He explained

> There is no reason for this behavior other than to distort market prices. . . .Every day, around [the close of the market], I see the structure of the market is being moved to bring prices in line with the trading books of whomever is manipulating the market with huge volumes of trades. This is in order to fix the price and make sure a profit is shown on the books.[42]

109. Through spoof trading, Defendants would be able to manipulate the Platts' physical (spot) Brent Crude oil price setting process, and thus the prices of physical (spot) Brent Crude oil and Brent Crude Oil Futures Contracts for their own financial benefit.

110. Finally, Defendants conspired with or otherwise obtained the cooperation of Platts to keep other market participants out of Platts' MOC price assessment process. One way in which market participants are kept out of Platts' MOC price assessment process is through sanctioning by Platts. Platts sanctions market participants that are allegedly not abiding by Platts' rules by (i) first having their indication excluded from the price assessment process for the day in question,

---

[41] Harlow is a constituency represented in the House of Commons of the UK Parliament.

[42] Karl West, *Watchdogs join oil giants on rack in price-fix case*, THE SUNDAY TIMES, May 19, 2013.

and (ii) denying such market participants the right to enter bids or offers into the Platts Window for a period of time solely determined by Platts.  Oil company Total has explained how excluding market participants from Platts' MOC price assessment process (*i.e.*, putting them "in the box") creates distortion in Platts' pricing of, for example, Brent Crude oil:

> In particular, Platts' procedure of putting market participants "in the box" when they believe such participants have not respected their reporting procedures reduces the number of transactions in the price reporting process, notably when it concerns key players in the market.  There are two main problems with boxing: there are often good arguments to the effect that participants did follow the procedures but can't appeal; the effect on price is indiscriminate and disproportionate (because you exclude from the price a vast portion of the market, which affects not only the boxed person but everyone).[43]

111.  In 2008, The New York Times ran a story about Platts' boxing of Lehman Brothers out of the Platts' Window, effectively ensuring that the trades Lehman engaged in would not be used in Platts' MOC price setting process.  A former energy trader was quoted as inquiring, "Are they a reporting agency or a pricing platform? . . . They can determine who can trade on their own system.  This is unusually powerful."[44]

112.  Additionally, as exemplified by ethanol producer Pannonia's experience in attempting to gain admission to Platts' price assessment process (*see* ¶ 84), new market participants that wish to participate have been kept out of the process for arbitrary or opaque reasons.

113.  Defendants conspired with or otherwise obtained the cooperation of Platts to keep certain market participants out of Platts' physical (spot) Brent Crude oil price setting process, by, among other methods, Platts' sanctioning of such market participants or denying them access to Platts' price assessment process, thereby distorting Platts' published physical (spot) Brent Crude oil price indexes.

---

[43] Total Reply at 4.
[44] London Energy Brokers' Association, *Response to IOSCO Consultation on the Functioning and Oversight of Oil Price Reporting Agencies*, at 17 (Mar. 30, 2012).

## VI.   <u>Defendants Shell and BP Have a History of Manipulating and Fixing Energy Prices</u>

114.   Defendants Shell and BP have a long history of manipulating prices in both physical and derivatives energy markets.  Defendants' subsidiaries have pled guilty and agreed to pay millions of dollars in fines for violating the CEA in other energy markets.

### A.   Shell

115.   On July 29, 2004, the CFTC announced the issuance of an administrative order initiating and simultaneously settling charges of false reporting and attempted manipulation of natural gas transactions by Shell's United States gas and power trading arm, Coral Energy Resources, L.P. ("Coral").  The administrative order found that from at least January 2000 through September 2002, Coral reported false, misleading or knowingly inaccurate natural gas trading information to PRAs, specifically that Coral reported information about trades that never occurred, altered price and volume information for certain trades, and failed to report some actual trades, all with the intent to affect the market price of natural gas.  According to the administrative order, Coral's conduct constituted an attempted manipulation under the CEA, which if successful, could have affected prices of NYMEX natural gas futures and options contracts.  The CFTC administrative order required Coral to pay a civil monetary penalty of $430 million.

116.   Coral, along with other defendants, also agreed to pay nearly $101 million to settle a class action lawsuit brought by persons that bought or sold natural gas futures and options on NYMEX.  The class action plaintiffs alleged that they suffered trading losses as a result of the defendants' manipulation of the natural gas market from 2000 through 2002.

117.   On November 9, 2007, the CFTC announced that a federal court in Houston, Texas entered a consent order settling charges by the CFTC that five (then) current and former Coral traders falsely reported and attempted to manipulate the natural gas market.  The order required the

defendants to pay, jointly and severally, a $1 million civil monetary penalty.  The consent order arose from a CFTC complaint filed on February 1, 2005 alleging that between October 2001 and June 2002, the traders knowingly delivered dozens of reports containing inaccurate trade information to compilers of natural gas monthly price indexes including Platts.  The complaint also alleged that the traders attempted to manipulate the price of natural gas in interstate commerce by reporting biased information to PRAs.

118.  On January 15, 2008, the CFTC announced that a jury found Coral trader Anthony Dizona guilty of violating the CEA by attempting to manipulate natural gas prices on eight separate occasions.  The jury verdict was based on the same February 1, 2005 CFTC complaint discussed directly above.

119.  On January 4, 2006, the CFTC announced the filing and simultaneous settlement of charges against Shell Trading US Company (STUSCO) and Shell International Trading and Shipping Co. (STASCO), subsidiaries of Shell, for engaging in prearranged trades on NYMEX. The CFTC order found that on five occasions between November 2003 and March 2004, STUSCO and STASCO traders prearranged trades for crude oil futures contracts by agreeing in advance on the quantity and the settlement months, agreeing to take the opposite positions of the trades, and executing the trades on NYMEX.  The CFTC order found the prearranged trades constituted fictitious sales in violation of the CEA and non-competitive transactions in violation of the CFTC's regulations.  The order also directed STASCO to pay a $200,000 civil penalty. Nigel Catterall, then head of the futures desk for STUSCO, agreed to pay $100,000 for his role in the unlawful conduct.

**B.   BP**

120.  In 2007, BP Products North America Inc. ("BP North America"), a subsidiary of Defendant BP, pled guilty and agreed to pay $303 million in civil and criminal penalties for

attempting to corner the United States propane market in early 2004.  Specifically, the CFTC

alleged that BP North America "purchased enormous quantities of propane to establish a

dominant and controlling" position in the market and then drove prices up 50 percent by keeping

fuel supplies off the market.[45]

121.   The consent order entered by the Honorable Ruben Castillo of the Northern District of

Illinois settling the charges brought against BP North America found that, in February 2004, BP

North America employees sought to, and did, corner the TET propane market for the purpose of

dictating prices to other market participants in order to obtain a significant trading profit.  The

consent order further found that by engaging in this conduct, BP North America employees

violated the CEA's prohibitions against manipulating the price of a commodity and cornering a

commodity market.  The consent order also found that BP North America employees attempted

to manipulate the price of TET propane in April 2003 by engaging in similar conduct.

122.   BP also agreed to pay $52 million to settle a class action lawsuit brought by customers

who said they paid inflated prices for TET propane in April 2003 and the first half of 2004.

**VII.  The EC Has Launched an Investigation into Defendants' Unlawful Conspiracy to
       Manipulate Prices of Physical (Spot) Brent Crude Oil and Brent Crude Oil Futures
       Contracts**

123.   On May 14, 2013, the EC announced that it, along with the European Free Trade

Association ("EFTA") Surveillance Authority in one European Economic Area Member State,

had carried out unannounced inspections of several suppliers and traders of crude oil, refined oil

products and biofuels sectors on suspicion that, since 2002, these companies colluded in

reporting distorted prices to Platts.  Specifically, the EC undertook the inspections because of

concerns that (i) the companies may have colluded in reporting distorted prices to a PRA (Platts)

---

[45] Steven Mufson, *BP Settles Propane Price-Fixing Suit*, THE WASHINGTON POST, Oct. 24, 2007,
http://www.washingtonpost.com/wp-dyn/content/article/2007/10/23/AR2007102302255.html.

to manipulate the published prices for a number of oil and biofuel products; and (ii) the

companies may have prevented others from participating in the price assessment process, with a

view to distorting published prices. As described by the EC,

> The prices assessed and published by Price Reporting Agencies serve as
> benchmarks for trade in the physical and financial derivative markets for a
> number of commodity products in Europe and globally. Even small distortions of
> assessed prices may have a huge impact on the prices of crude oil, refined oil
> products and biofuels purchases and sales, potentially harming financial
> consumers.[46]

124.  Almost immediately following the EC's announcement, Defendants BP, Shell and Statoil

each confirmed they are the subject of the EC investigation. In particular, Defendant Statoil

confirmed that its office in Stavanger (Norway) was subject to an inspection by the EFTA

Surveillance Authority, assisted by the Norwegian Competition Authority. Statoil acknowledged

that the inspection was carried out at the request of the EC.  Further, Statoil confirmed that the

scope of the EC's investigation is "related to the Platts' Market-On-Close price assessment

process, used to report prices in particular for crude oil, refined oil products and biofuels"

extending back to as early as 2002.[47]

125.  Platts also confirmed that its London offices were raided by the EC.

126.  Additionally, as part of its investigation, the EC has asked major market players, including

Finland's only refiner, Neste Oil Oyj, and Italy's largest oil company, Eni SpA, as well as

several major energy traders including Glencore Xstrata plc, Vitol Group and Gunvor Group

Ltd., to provide information on Platts' MOC process.

---

[46] Press Release, EC, Antitrust:  Commission confirms unannounced inspections in oil and
biofuels sectors (May 14, 2013), http://europa.eu/rapid/press-release_MEMO-13-435_en.htm.
[47] Brian Swint, Lananh Nguyen & Joe Carroll, *Shell Targeted with BP in EU Price Fixing Probe
for Oil: Energy*, Bloomberg, May 15, 2013, http://www.bloomberg.com/news/2013-05-
14/statoil-raided-by-competition-authorities-in-oil-price-probe.html.

127. On May 21, 2013, Reuters reported on the list of questions the EC sent to market participants as part of its investigation into manipulation of prices reported to Platts. According to Reuters, the EC is seeking to identify whether one or more companies have been prevented from joining Platts' MOC process, and whether participants in the MOC process submitted prices that were not a true reflection of the market or were otherwise falsely submitted to Platts.[48]

128. On May 17, 2013, the U.K. Serious Fraud Office ("SFO") announced that it was "urgently reviewing" the EC's allegations of price-fixing in the oil markets and determining whether to accept the case for "criminal investigation."[49] That same day, Senator Ron Wyden, who chairs the Senate Energy Committee, urged the United States Department of Justice to begin an investigation into this matter.

### RELEVANT MARKET

129. The Relevant Market is the physical (spot) Brent Crude oil market.

### DEFENDANTS' MONOPOLY POWER IN THE RELEVANT MARKET

130. Defendants attempted and conspired to monopolize and did monopolize the Relevant Market by, *inter alia*, controlling Platts' published prices for physical (spot) Brent Crude oil during the Class Period, which in turn determined prices for physical (spot) Brent Crude oil.

131. Defendants did so by (i) colluding in the deliberate and systematic submission of false or misleading physical (spot) Brent Crude oil bid, offer and transaction data to Platts; (ii) engaging in spoof trading, wherein they placed large hypothetical trades and then withdrew the offers to

---

[48] Dimitry Zhdannikov and Peg Mackey, *Europe oil probe seeks market abuse evidence in 2010-2013*, REUTERS, May 21, 2012, http://www.reuters.com/article/2013/05/21/oil-pricing-idUSL6N0E230T20130521.
[49] Selina Williams, *UK Serious Fraud Office: "Urgently Reviewing" Matter*, WALL STREET J., May 17, 2013, http://online.wsj.com/article/BT-CO-20130517-703005.html.

manipulate the market; and (iii) conspiring with or obtaining the cooperation of Platts to exclude other market participants from the MOC price setting process. (*see* ¶¶ 107-13).

132.   Defendants thereby uneconomically and restrictively excluded competitors from Platts' MOC price assessment process for physical (spot) Brent Crude oil which sets the price for physical (spot) Brent Crude oil.

133.   Defendants' price control of the Relevant Market during the Class Period reflects unlawful monopoly power and collusion.

## CLASS ACTION ALLEGATIONS

134.   Plaintiff brings this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on her own behalf and as a representative of the following Class:[50]

> All persons or entities (other than Defendants and any parent, subsidiary, affiliate, or agent of any Defendant) that purchased or sold one or more Brent Crude Oil Futures Contract(s) during the Class Period.

135.   The Class is so numerous that the individual joinder of all members is impracticable. Due to the nature of the commerce involved, the members of the Class are geographically dispersed throughout the United States.  The number and identities of the members of the Class are unknown to Plaintiff at this time, but can be ascertained from readily available information. Plaintiff is informed and believes that there are thousands or more members of the Class.

136.   Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. These common questions of law and facts include, without limitation:

   (a)    Whether Defendants manipulated the prices of Brent Crude Oil Futures Contracts in

          violation of the CEA;

---

[50] Plaintiff has defined the Class based on currently available information and hereby reserves the right to amend the definition of the Class, including, without limitation, the Class Period.

(b)     Whether such manipulation caused the prices of Brent Crude Oil Futures Contracts to be artificial;

(c)     Whether such manipulation caused cognizable legal injury under the CEA;

(d)     Whether Defendants' unlawful actions violate Section 1 of the Sherman Antitrust Act;

(e)     Whether Defendants possess monopoly power in the physical (spot) Brent Crude oil market;

(f)     Whether, through the conduct alleged herein, Defendants willfully acquired, maintained, and enhanced their monopoly power in the Relevant Market in violation of Section 2 of the Sherman Antitrust Act;

(h)     Whether Defendants' unlawful conduct caused injury to the business or property of Plaintiff and the Class;

(i)     Whether such injury or the fact or extent of such price artificiality may be established by common, class-wide means, including, for example, by regression analysis, econometric formula, or other economic tests; and

(j)     The operative time period and extent of Defendants' foregoing violations.

137.  Plaintiff's claims are typical of the claims of the other members of the Class.  Plaintiff and the members of the Class were injured by the same course of manipulative and unlawful, anticompetitive conduct and make the same legal claims. The injuries and damages of each member of the Class were directly caused by Defendants' wrongful conduct in violation of the laws as alleged herein.

138.  Plaintiff will fully and adequately protect the interests of all members of the Class. Plaintiff is an adequate representative of the Class and has no interests which are adverse to the

interests of absent Class members.  Plaintiff has retained counsel competent and experienced in

class action litigation, including commodity futures manipulation class actions and antitrust class

actions.

139.   A class action is superior to other available methods (if any) for the fair and efficient

adjudication of this controversy because joinder of all Class members is impracticable.  The

prosecution of separate actions by individual members of the Class would impose heavy burdens

upon the courts, and would create a risk of inconsistent or varying adjudications of the questions of

law and fact common to the Class, establishing incompatible standards of conduct for the

Defendants.  A class action, on the other hand, would achieve substantial economies of time, effort,

and expense, and would assure uniformity of decision with respect to persons similarly situated

without sacrificing procedural fairness or bringing about other undesirable results.

140.   The interest of members of the Class in individually controlling the prosecution of separate

actions is theoretical rather than practical.  The Class has a high degree of cohesion, and

prosecution of the action through representatives would be unobjectionable.  The damages

suffered by the individual members of the Class may be relatively small; and therefore, the

expense and burden of individual litigation make it virtually impossible for them to redress the

wrongs done to them.

141.   Plaintiff is unaware of any difficulties that are likely to be encountered in the management

of this action that would preclude its maintenance as a class action.

### INJURY TO PLAINTIFF AND THE MEMBERS OF THE CLASS

142.   During the Class Period, Plaintiff and the members of the Class purchased or sold Brent

Crude Oil Futures Contracts at artificial prices and were deprived of a lawfully operating market.

143.   Further, by reason of the alleged violations of the CEA and Sections 1 and 2 of the

Sherman Antitrust Act, Plaintiff and the members of the Class paid prices that were not what

they would have paid in the absence of Defendants' unlawful conduct. As a result, Plaintiff and the members of the Class have suffered a legally cognizable injury due to Defendants' violations.

144. Defendants' conspiracy to manipulate, and manipulation of, physical (spot) Brent Crude oil prices caused fluctuating amounts of artificiality in the prices of Brent Crude Oil Futures Contracts during the Class Period.

145. Similarly, the specific amounts of actual damages under the CEA have not yet been determined because such determination will require discovery from Defendants and from non-parties such as Platts, ICE and NYMEX.

### CAUSATION OF ARTIFICIAL PRICES AND ARTIFICIAL PRICE TRENDS

146. By manipulating Platts' physical (spot) Brent Crude oil price setting process, and in turn the price of physical (spot) Brent Crude oil, Defendants necessarily and intentionally manipulated the prices of Brent Crude Oil Futures Contracts.

147. Defendants also directly, foreseeably and intentionally caused participants in the Brent Crude Oil Futures Contracts market to trade such standardized futures contracts at artificial price levels. This is because the prices of Brent Crude Oil Futures Contracts are inextricably linked with the prices of physical (spot) Brent Crude oil (*see* ¶¶ 62-68).

148. Thus, the direct and foreseeable effect of Defendants' conspiracy to manipulate, and manipulation of, physical (spot) Brent Crude oil prices was to intentionally cause Plaintiff and the Class to trade Brent Crude Oil Futures Contracts at artificial prices.

149. Each Defendant well knew, based on its financial sophistication and familiarity with Brent Crude Oil Futures Contracts that such contracts are traded based on physical (spot) Brent Crude oil prices.

150.  Defendants in fact actively traded Brent Crude Oil Futures Contracts during the Class Period.

151.  Therefore, each Defendant also necessarily knew, and unavoidably and specifically intended, that its manipulation of Platts' physical (spot) Brent Crude oil price setting process would cause physical (spot) Brent Crude oil and Brent Crude Oil Futures Contracts to trade at artificial prices.

## PLAINTIFF'S CLAIMS ARE NOT BARRED BY THE STATUTE OF LIMITATIONS

**I.    The Statute of Limitations Did Not Begin to Run Because Plaintiff Did Not and Could Not Discover Her Claims**

152.  Plaintiff repeats and re-alleges the allegations set forth above.

153.  Plaintiff and the members of the Class had no knowledge of the combination or conspiracy alleged herein, or of facts sufficient to place them on inquiry notice of the claims set forth herein, until shortly before the filing of this Complaint.  Plaintiff and the members of the Class did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy and other unlawful conduct alleged herein until May 14, 2013, the date the EC publicly announced raids of certain Defendants' offices on suspicion that they colluded in reporting artificial prices to a PRA (Platts) to manipulate the published prices for a number of oil and biofuel products.

154.  By its very nature, as alleged herein, the unlawful activity that Defendants engaged in was self-concealing. Defendants, *inter alia*, falsely reported bid, offer and transaction data to Platts in order to manipulate the physical (spot) price for Brent Crude oil and the prices of Brent Crude Oil Futures Contracts.

155.  Plaintiff and the members of the Class had no knowledge of the unlawful conduct alleged in this Complaint, or of any facts that could or would have led to the discovery thereof, until it

became public when the EC announced raids of certain Defendants' offices on suspicion that

they colluded in reporting artificial prices to a PRA (Platts) to manipulate the published prices

for a number of oil and biofuel products.

156.   For these reasons, the statute of limitations as to Plaintiff's and the Class' claims did not

begin to run, and has been tolled, with respect to the claims that Plaintiff and the Class allege in

this Complaint.

## II.   Fraudulent Concealment Tolled the Statute of Limitations

157.   In the alternative, application of the doctrine of fraudulent concealment tolled the statute of

limitations as to the claims asserted herein by Plaintiff and the members of the Class.  Plaintiff

and the members of the Class did not know and could not have known of the existence of the

conspiracy and other unlawful conduct alleged herein until May 14, 2013, at the earliest, the date

the EC announced raids of Defendants' offices on suspicion that they colluded in reporting

artificial prices to a PRA (Platts) to manipulate the published prices for a number of oil and

biofuel products.

158.   Before that time, Plaintiff and the members of the Class were unaware of Defendants'

unlawful conduct, and Plaintiff and the members of the Class did not know that they were

trading Brent Crude Oil Futures Contracts at artificial prices.

159.   By its very nature, as alleged herein, the unlawful activity that Defendants engaged in was

self-concealing.  Defendants, *inter alia*, falsely reported bid, offer and transaction data to Platts

in order to manipulate the physical (spot) prices for Brent Crude oil and the prices of Brent

Crude Oil Futures Contracts.

160.   Because the Defendants employed acts and techniques that were calculated to wrongfully

conceal the existence of such illegal conduct, Plaintiff and the members of the Class could not

have discovered the existence of this unlawful conduct any earlier than its public disclosure on May 14, 2013.

161.   Because the alleged conspiracy was both self-concealing and affirmatively concealed by Defendants and their co-conspirators, Plaintiff and the members of the Class had no knowledge of the alleged conspiracy, or of any facts or information that would have caused a reasonably diligent person to investigate whether a conspiracy existed, until May 14, 2013, when the EC announced raids of Defendants' offices on suspicion that they colluded in reporting artificial prices to a PRA (Platts) to manipulate the published prices for a number of oil and biofuel products.

162.   For these reasons, the statute of limitations applicable to Plaintiff's and the Class' claims was tolled and did not begin to run until May 14, 2013.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

**(Manipulation in Violation of the Commodity Exchange Act, 7 U.S.C. §§ 1, *et seq.)***

**Against All Defendants**

163.   Plaintiff repeats and re-alleges the allegations set forth above.

164.   By their intentional and unlawful conduct, Defendants each violated Section 9(a)(2) of the Act, 7 U.S.C. § 13(a)(2), and caused prices of Brent Crude Oil Futures Contracts to be artificial during the Class Period.

165.   Defendants' undisclosed conduct and trading activity alleged herein constituted market power manipulation of the prices of Brent Crude Oil Futures Contracts in violation of Sections 9(a) and 22(a) of the CEA, 7 U.S.C. §§ 13(a) and 25(a).

166.   Defendants' foregoing manipulative conduct deprived Plaintiff and other traders of a lawfully operating market during the Class Period.

167.   Plaintiff and others who transacted in Brent Crude Oil Futures Contracts during the Class Period transacted at artificial prices resulting from Defendants' manipulation in violation of the Commodity Exchange Act, 7 U.S.C. § 1, *et seq.*, and as a direct result thereof were injured and suffered damages.

168.   Plaintiff and the members of the Class are each entitled to damages for the violations of the CEA alleged herein.

169.   Plaintiff and the members of the Class who purchased or sold one or more Brent Crude Oil Futures Contract(s) during the Class Period were injured and are each entitled to their actual damages for the violations of the CEA alleged herein.

## SECOND CLAIM FOR RELIEF

### (Principal-Agent Liability in Violation of the Commodity Exchange Act, 7 U.S.C. §§ 1, *et seq.*)

### Against All Defendants

170.   Plaintiff repeats and re-alleges the allegations set forth above.

171.   Under Section 2(a)(l)(B) of the CEA, 7 U.S.C. § 2(a)(l)(B), each of the Defendants is liable for the manipulative acts of its agents, representatives, and/or other persons acting for it in the scope of their employment.

172.   Plaintiff and the members of the Class who purchased or sold one or more Brent Crude Oil Futures Contract(s) during the Class Period were injured and are each entitled to their actual damages for the violations of the CEA alleged herein.

## THIRD CLAIM FOR RELIEF

### (Aiding and Abetting Manipulation in Violation of the Commodity Exchange Act,

**7 U.S.C. §§ 1, *et seq.)***

**Against All Defendants**

173.   Plaintiff repeats and re-alleges the allegations set forth above.

174.   Defendants knowingly aided, abetted, counseled, induced and/or procured the violations of the CEA alleged herein. Defendants did so knowing of each other's manipulation of the prices of Brent Crude Oil Futures Contracts through their deliberate reporting of inaccurate, misleading and false physical (spot) Brent Crude oil bid, offer and transaction information to Platts, which resulted in Brent Crude Oil Futures Contracts reaching artificial levels during the Class Period in violation of Section 22(a)(l) of the CEA, 7 U.S.C. § 25(a)(l).

175.   Plaintiff and the members of the Class who purchased or sold one or more Brent Crude Oil Futures Contract(s) during the Class Period were injured and are each entitled to their actual damages for the violations of the CEA alleged herein.

**FOURTH CLAIM FOR RELIEF**

**(Violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. §1, *et seq.)***

**Against All Defendants**

176.   Plaintiff repeats and re-alleges the allegations set forth above.

177.   Defendants entered into and engaged in a conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Antitrust Act and Section 4 of the Clayton Act.

178.   The conspiracy consisted of a continuing agreement, understanding or concerted action between and among Defendants and their co-conspirators in furtherance of which Defendants fixed, maintained, suppressed and/or made artificial physical (spot) Brent Crude oil prices and the prices of Brent Crude Oil Futures Contracts.  Defendants' conspiracy constitutes a *per se*

violation of the federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade.

179.   Defendants' conspiracy, and its resulting impact on the prices of Brent Crude Oil Futures Contracts, occurred in or affected interstate and international commerce.

180.   As a proximate result of Defendants' unlawful conduct, Plaintiff and the members of the Class have suffered injury to their business or property.

181.   Plaintiff and the members of the Class are each entitled to treble damages for the Defendants' violations of the Sherman Antitrust Act alleged herein, and a permanent injunction restraining Defendants from engaging in additional anticompetitive conduct.

## FIFTH CLAIM FOR RELIEF

### (Violation of Section 2 of the Sherman Antitrust Act, 15 U.S.C. §2)

### Against All Defendants

182.   Plaintiff repeats and re-alleges the allegations set forth above.

183.   Defendants acquired, willfully maintained, and unlawfully exercised monopoly power in the Relevant Market by their deliberate reporting of inaccurate, misleading and false physical (spot) Brent Crude oil bid, offer and transaction information to Platts, which resulted in Platts publishing distorted and manipulated prices for physical (spot) Brent Crude oil.  Platts' published prices for physical (spot) Brent Crude oil are used to set prices for physical (spot) Brent Crude oil.

184.   During the Class Period, Defendants had the power to and did in fact set or otherwise control prices for physical (spot) Brent Crude oil.  There is no legitimate business justification for Defendants' actions and the conduct through which they acquired and maintained monopoly power in the Relevant Market.

185.  The anticompetitive effects of Defendants' conduct far outweigh any possible procompetitive benefits or justifications.

186.  Defendants also attempted and conspired to monopolize the Relevant Market, and artificially set and directly impacted prices through their unlawful conduct.  As previously alleged herein, Defendants' unlawful conduct in the Relevant Market artificially set and directly impacted the prices of Brent Crude Oil Futures Contracts.

187.  Plaintiff and the members of the Class have been injured in their business or property by Defendants' conspiracy to monopolize, attempted monopolization and monopolization of the Relevant Market.  Without limiting the generality of the foregoing, Plaintiff and members of the Class have paid artificial prices for Brent Crude Oil Futures Contracts as a result of Defendants' anticompetitive conduct in violation of Section 2 of the Sherman Antitrust Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

A.  For an order certifying this lawsuit as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure, and designating Plaintiff as the Class representative, and her counsel be appointed as Class counsel;

B.  For a declaratory judgment that all Defendants manipulated the prices of Brent Crude Oil Futures Contracts in violation of Section 9(a) of the CEA, 7 U.S.C. § 13(a);

C.  For a declaratory judgment that Defendants are liable for the acts of their agents, representatives, and/or other persons acting for them in the scope of their employment pursuant to Section 2(a)(1)(B) of the CEA, 7 U.S.C. § 2(a)(1)(B);

D.  For a declaratory judgment that Defendants aided and abetted the manipulation alleged herein in violation of Section 22(a)(l) of the CEA, 7 U.S.C. § 25(a)(l);

E.     For a judgment awarding Plaintiff and the members of the Class damages against Defendants for their violations of the CEA, together with prejudgment interest at the maximum rate allowable by law;

F.     For the unlawful, anticompetitive conduct alleged herein to be adjudged and decreed to be in violation of Sections 1 and 2 of the Sherman Antitrust Act;

G.     For Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the anticompetitive conduct alleged herein, or from entering into any other anticompetitive conduct having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar anticompetitive purpose or effect.

H.     For a judgment awarding Plaintiff and the members of the Class damages against Defendants for their violations of the federal antitrust laws, in an amount to be trebled in accordance with such laws;

I.     For an award to Plaintiff and the members of the Class of their costs of suit, including reasonable attorneys' and experts' fees and expenses; and

J.     For such other and further relief as the Court may deem just and proper.

## DEMAND FOR A JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff respectfully demands a trial by jury of all issues so triable.

Dated:      New York, New York
            June 14, 2013

                                    **ROBINS, KAPLAN, MILLER**
                                    **& CIRESI L.L.P.**

                                    By

                                    Kellie Lerner
                                    Hollis Salzman
                                    Bernard Persky
                                    601 Lexington Avenue
                                    New York, NY 10022
                                    Telephone:  (212) 980-7400
                                    Facsimile:  (212) 980-7499
                                    klerner@rkmc.com
                                    hsalzman@rkmc.com
                                    bpersky@rkmc.com

                                    K. Craig Wildfang
                                    Thomas J. Undlin
                                    Ryan W. Marth
                                    **ROBINS, KAPLAN, MILLER**
                                    **& CIRESI L.L.P.**
                                    800 LaSalle Avenue
                                    2800 LaSalle Plaza
                                    Minneapolis, MN 55402-2015
                                    Telephone:  (612) 349-8500
                                    Facsimile:  (612) 339-4181
                                    kcwildfang@rkmc.com
                                    tjundlin@rkmc.com
                                    rwmarth@rkmc.com

                                    Joseph A. Clark
                                    Greg Collett
                                    **COLLETT CLARK LLP**
                                    The Coastal Building
                                    151 Bodman Place, Suite 202
                                    Red Bank, New Jersey 07701
                                    Telephone:  (732) 945-4055
                                    Facsimile:  (732) 576-5960
                                    joe.clark@collettclark.com
                                    greg.collett@collettclark.com

                                    Christopher J. Gray
                                    **LAW OFFICE OF CHRISTOPHER J.**
                                    **GRAY, P.C.**

                              53

360 Lexington Avenue
14th Floor
New York, NY 10017
Telephone:  (212) 838-3221
gray@cjgraylaw.com

*Counsel for Plaintiff and the Proposed
Class*